JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Joseph Arriaga

**(b)** County of Residence of First Listed Plaintiff Travis
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Sonia Ansari, The Ko Law Firm, PLLC 512-228-9756
8310 N. Capital of Texas Hwy
Prominent Pointe I, Suite 305 Austin, TX 78731

**DEFENDANTS**

Publicis Sapient

County of Residence of First Listed Defendant Travis
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)* Eric Vinson
Littler
evinson@littler.com

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☒ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 USC Section 2614(a)(1) and 29 USC Section 2615(a) Family and Medical Leave Act

Brief description of cause:
Breach of compensation and severance agreements and violations of FMLA

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $** $250,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions)*: JUDGE ______ DOCKET NUMBER ______

DATE 2/1/2021 SIGNATURE OF ATTORNEY OF RECORD [signature]

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **Joseph Arriaga**<br>***Plaintiff*** | §<br>§<br>§<br>§<br>§ | **Case No. 1:21-cv-00097** |
| **v.** | § | |
| **Publicis Sapient**<br>***Defendant*** | §<br>§<br>§ | **Jury Trial Requested** |

**PLAINTIFF'S ORIGINAL COMPLAINT**

## I. PARTIES

### A. THE PLAINTIFF

1. Joseph Arriaga is a resident of Austin, Texas and former employee of the Defendant, Publicis Sapient.

### B. THE DEFENDANT

2. Publicis Sapient is a public corporation with headquarters in Boston, Massachusetts and a local office in Austin, Texas.
3. Publicis Sapient can be served by certified mail to its Chief Executive Officer, Nigel Vaz, at 40 Water Street Boston, MA 02109.

## II. JURISDICTION AND VENUE

4. This court has jurisdiction over the subject matter and parties pursuant to U.S.C. § 1331 as this case involves questions of federal law. This court has jurisdiction pursuant to questions under the Family and Medical Leave Act.

5. Venue is appropriate in Austin, Texas because Plaintiff was always based out of Defendant's local Austin office, and Austin is where a majority of the events giving rise to the claims in this lawsuit occurred.

6. The amount in controversy is more than $75,000, not counting interest and costs of court.

## III. STATEMENT OF CLAIMS

### A. BREACH OF COMPENSATION AGREEMENT

7. Mr. Arriaga began working for Publicis Sapient on February 20, 2017 as an Engagement Manager. As an Engagement Manager, his job was to build strong, trusted relationships with clients around the implementation of Salesforce.com. He was the primary liaison with client executives and project sponsors.

8. Mr. Arriaga was paid a base salary of $150,000 annually, and he earned commissions on projects in which he made a "material contribution" to the sales cycle. See Exhibit 1, Compensation Agreement.

9. One of the primary issues in this case is that Publicis Sapient failed to pay Mr. Arriaga his earned commissions for projects and invoices across two accounts, Exxon and Marathon Petroleum. Mr. Arriaga made significant material contributions to both accounts in the first and second quarters of 2020.

10. The Customer Portal for the Marathon account was co-led by Mr. Arriaga and Mr. Nagpal, with support from Sid Bahl and Kathryn Bonner. This opportunity was a product of Mr. Arriaga's direct relationship with Jin Son of Salesforce. Without that relationship, Publicis Sapient would not have had any access to this opportunity. This pursuit started in January 2019 and resulted in an RFP submission created by

Mr. Arriaga. This resulted in Publicis Sapient being down selected and gave the company the opportunity to present an oral presentation onsite the week of March.

11. Mr. Arriaga was the owner of the presentation and led most of the onsite presentation to the client. This presentation was also attended by Mr. Bahl, Mr. Nagpal, and Ms. Bonner. After much back and forth as well as an additional onsite the week of April 30 with the eventual project team, Publicis Sapient was able to sign the initial SOW, initiating the project.

12. This project was extremely difficult to execute, and Publicis Sapient struggled to maintain resource continuity. Through multiple client visits, coordination with Salesforce, and Mr. Arriaga inserting himself as a resource for UI design, Publicis Sapient was able to continue to partner with Marathon to close out 2019.

13. Mr. Arriaga drafted the Change Order #2 in collaboration with Mr. Kimby Seifert, who began taking a more active role in the account in the fourth quarter of 2019 to get it back on track. This SOW was managed by Mr. Seifert but was based on Mr. Arriaga’s direct input and direction. This included resource allocation and mix. Mr. Arriaga also led the effort to review Change Order #2 with Salesforce and worked to repair the frayed partnership. Additionally, because the resources needed were not free at the time needed, Mr. Arriaga introduced Publicis Sapient to personal contacts of his that made nearshore resources available and allowed the project to continue with the resourcing outlined in Change Order #2. This is extremely rare for an Engagement Manager but shows how Mr. Arriaga's contribution was both material and critical to the engagement. All of this can be confirmed by Mr. Seifert, Nadine Abdallah, Julia Moody, and Deepak Nagpal.

14. Mr. Arriaga also materially contributed to the sales cycle of the Marathon account. The Hauler Portal project for the Marathon account was a sales cycle that began in 2019. Mr. Arriaga led the project approach, customer pitch, and solution demo. Mr. Arriaga's conversations with Marathon continued through the third quarter of 2019, and he also worked internally and with Salesforce. This can be confirmed by Puneet Arora, Mr. Nagpal, and Jin Son. Client-side challenges with staffing delayed the project.

15. Ms. Abdallah, who took over the account from Mr. Nagpal, and Mr. Arriaga restarted conversations with Marathon in the fourth quarter of 2019 and were able to secure a signed contract with Marathon in January 2020 effectively ending the sales cycle of the project. Mr. Arriaga wrote the SOW scope, assumptions, and staffing plan. This can be confirmed by Ms. Abdallah and Mr. Siefert.

16. The Hauler Portal project then went into delivery mode, and Mr. Arriaga was responsible for knowledge transfer to Michael Conner and the project team. This took place during the first two weeks in January 2020 across multiple meetings. This can be confirmed by Michael Conner and Josh Johnson of the project team.

17. Mr. Arriaga also made material contributions to the sales cycle of the Exxon account, which began in November 2018 and was a direct result of Mr. Arriaga's relationship with Salesforce AE, Ryan Nelson. While Exxon had been a Publicis Sapient client in the past, no work of significance had been done with them in a long time. The relationship with Exxon began with a Pardot implementation led by Mr. Arriaga, with assistance from Pranjal Srivastava and Akhil Segal.

18. After the successful pitch of the Pardot implementation, Mr. Arriaga and his team

began to branch out into other projects (the E2E Data Driven Engagement being one of these projects). While this project was led by Mr. Srivastava, Mr. Arriaga gave significant direction to the technical team as to the approach, design, and value propositions used in the initial pitch. A search of chatter posts related to the E2E project would show Mr. Arriaga's material contributions to coordination of staffing as well. So significant was Mr. Arriaga's contribution that Mr. Srivastava asked Mr. Arriaga to attend the pitch meeting with Exxon. Mr. Arriaga could not attend in person because he was onsite with Marathon at the time but he did conference into the meeting.

19. Mr. Arriaga's reduction in involvement on the Exxon account was not his choice but instead a punishment for the paternity leave he took. This project phase was signed in February/March 2020, and it was not until Mr. Arriaga's termination that he was told he did not contribute materially. On February 11, 2020, Mr. Arriaga discussed the unfair nature of his role reduction with Jason English. Mr. Arriaga was assured that his material contribution would be recognized, and this was reiterated to Mr. Arriaga on several occasions during the weeks that followed.

20. Under Mr. Arriaga's compensation agreement, Publicis Sapient owes Mr. Arriaga $91,992.80 in commissions for the material contributions he made to the sales cycles of the Exxon and Marathon accounts. Please see Exhibit 2 for a breakdown of the commissions Mr. Arriaga is owed.

**B. VIOLATIONS OF FAMILY AND MEDICAL LEAVE ACT**

21. Mr. Arriaga applied for paternity leave under the Family and Medical Leave Act (FMLA) in December 2019. It was approved by Jason English.

22. Mr. Arriaga took four weeks of paternity leave from January 14 – February 11, 2019. Mr. Arriaga's son was born premature and was in the NICU, and his wife was unable to walk but he still made every effort to make his leave as least disruptive as possible to Publicis Sapient. For example, he was asked to push his leave back so he could join several Exxon pitch kickoff calls, which he did.

23. On January 13, 2019, when Mr. Arriaga told Pranjal Srivastava, Client Director at Publicis Sapient, that he was taking paternity leave, Mr. Srivastava referred to Mr. Arriaga's leave as "vacation" and asked if he could move it.

24. When Mr. Arriaga told Mr. Srivastava that he could not move the dates of his paternity leave, Mr. Akhil Sehgal, Vice President at Publicis Sapient, called Mr. Arriaga and asked him why he was taking leave and again asked him if he could move it, stressing the importance of the new opportunity with Exxon.

25. As of January 7, 2020, Mr. Arriaga's territory included all Energy & Commodity accounts, with a handful of exceptions. Prior to taking paternity leave, Mr. Arriaga presented to Publicis Sapient leadership a territory plan that included accounts with the largest commission potential in 2020. This plan was approved by Jason English.

26. On January 15, 2020, while Mr. Arriaga was on paternity leave, Mr. English met with Mr. Mudit Kapur and Energy & Commodity leaders, and Publicis Sapient decided to phase Mr. Arriaga out of Energy & Commodity involvement.

27. On February 11, 2020, Mr. Arriaga's first day back at work after taking paternity leave, he received a call at 8 a.m. from Mr. English informing Mr. Arriaga that he would no longer have Exxon as an account. Mr. English told Mr. Arriaga he did

not know the exact reason that Mr. Arriaga was being pulled from the Exxon account but that it was at the request of Mr. Kapur.

28. Mr. Arriaga then reached out Mr. Kapur, and the two men had lunch on February 20, 2020. During this lunch, Mr. Kapur said that Mr. Arriaga should have been wiser in taking leave when there was such a huge opportunity on the line. Mr. Kapur referred to Mr. Arriaga's paternity leave as "optional" time off and said Mr. Arriaga would need to start over and prove himself to show his value to the team.

29. In March 2020, a new Engagement Manager joined the team and took over all of the accounts Mr. Arriaga had previously been working on. However, there is an email from Mr. English on April 9, 2020 stating Mr. Arriaga was still the owner of Marathon.

30. Publicis Sapient violated 29 USC § 2614(a)(1) by stripping Mr. Arriaga of his accounts as retaliation for his taking of paternity leave. Mr. English as the Practice Lead took Mr. Arriaga's accounts away from him at the direction and guidance of Mr. Kapur and other Energy & Commodity leaders.

31. When Mr. Arriaga planned to take the rest of paternity leave this summer as had been agreed to when he took the initial portion of his paternity leave, he received a phone call on June 24, 2020 from Mr. English and Ms. Elizabeth Haskell informing him that he was being fired as part of a resource reduction. Mr. Arriaga never received anything in writing about his firing nor was he given any more information.

32. Mr. Arriaga was consistently a top performer in terms of booked revenue for Publicis Sapient in 2019 and 2020.

33. Publicis Sapient violated 29 USC § 2615(a) when the company fired Mr. Arriaga as retaliation for his attempt to exercise his right to take paternity leave under the FMLA.

**C. BREACH OF SEVERANCE AGREEMENT**

34. Publicis Sapient previously offered to Mr. Arriaga six weeks of severance ($17,307.69), plus an additional two weeks of paid paternity leave and other compensation to defray his COBRA costs, totaling $27,276.69. However, after Mr. Arriaga sought payment for his unpaid commissions and FMLA claim, Defendant refused to release this money unless Mr. Arriaga released Defendant from him claims for unpaid commissions and his FMLA claim.

35. Mr. Arriaga seeks the $27,276.69 in severance he is owed by Publicis Sapient.

## IV. RELIEF

36. Mr. Arriaga seeks the $91,992.80 in unpaid commissions on the Marathon and Exxon accounts.

37. Mr. Arriaga also seeks the lost wages and commissions due to Publicis Sapient's retaliation against him for taking paternity leave. While it is somewhat difficult to calculate the loss of income Mr. Arriaga suffered due to his FMLA claim, we can use his past history of booked revenue as guidance. Mr. Arriaga closed $2.7 million in the first quarter of 2020 and had an additional $9-12 million in the pipeline for the rest of 2020. A conservative win rate of 20 percent of the $12 million pipeline would have netted Mr. Arriaga at least $120,000.00 in commissions.

38. Mr. Arriaga also seeks the $27,276.69 in severance he is owed by Public Sapient.

39. Mr. Arriaga seeks all costs of court as well as pre- and post-judgment interest.

## V. CERTIFICATION AND CLOSING

40. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

February 1, 2021

/s/Sonia Ansari
SONIA ANSARI
State Bar No. 24045414
**ATTORNEY FOR PLAINTIFF JOSEPH ARRIAGA**

THE KO LAW FIRM, PLLC
8310 North Capital of Texas Highway
Prominent Pointe I
Suite 305
Austin, Texas 78731
Phone: 512-228-9756
Fax: 512-419-9293
E-Mail: sonia@jwalegal.com

# EXHIBIT 1

# Compensation Plan

## Publicis Sapient Salesforce Practice (PSSP)

Effective January 1, 2020 – December 31, 2020

The following Commission Plan is effective as of January 1, 2020 and until further notice for PSSP Engagement Managers while actively employed at PSSP. This plan is in effect for eligible Employees until another plan or agreement supersedes it.

Eligibility:

Engagement Managers may receive a commission for the sale and delivery of professional services. Commissions are calculated on recognized revenue generated by the delivery of services. The individual must be actively employed at the time a commission is paid to be eligible to receive a commission. Individuals under this plan will not be eligible to receive a bonus under the Publicis Groupe bonus plan.

Commission Funding

Commissions will be paid on any revenues generated on a closed-won opportunity owned by the eligible Employee where revenues have been recognized and recorded where the EM demonstrated material contribution to a sales cycle. Material contribution will be determined by the Salesforce Practice Leader, and Regional CFO, with confirmation as needed from the Industry Leader. For purposes of clarity, material contribution includes but is not limited to: active involvement in scoping, negotiation and closing a deal; and/or active alignment and engagement with Salesforce at a specific account; and/or active engagement with the customer directly. Material contribution will be represented in the Level of Influence flag in the Practices/Alliances functionality in the 360 instance of Salesforce. Opportunities tagged with a “2” or “3” will symbolize material contribution.

Commission Calculations

The Commission includes a payment for Revenue and Profit as calculated follows:

- Commissionable Revenue: 2.5% X commissionable revenue generated by the delivery of services for opportunities sold by the employee. Commissionable Revenues means actual revenues recorded. Commissionable Revenues does not include expenses, taxes, software referral fees, or pass-through subcontract revenues submitted to the client for reimbursement.
- Profit Commission: 5.0% of Gross Profit (Revenue X Gross Margin %). Gross Margin % is calculated at total Commissionable Revenue minus cost of goods sold (COGS), divided by total Commissionable Revenue, expressed as a percentage.
- **Effective January 01, 2020**, if Gross Margin % is less than or equal to 35.0%, the Project



will not be eligible for a Profit Commission. The Commissionable Revenue payment will not be affected by a low profitability project. **When this clause goes into effect on January 1, 2020, it will apply to all active projects including those sold or started prior to the effective date.**

- Commission Splits:
    - If multiple commissionable employees are involved on an opportunity, those employees will prearrange the involvement of each member and determine the "split" of responsibility and associated revenue recognition. All opportunities that require commission splits must be agreed upon by all commissionable employees on the opportunity and approved by sales manager prior to closing the opportunity. Executive management has final say in any commission splits.

Timing of Commission Payment

Commissions earned from recognized revenue will be paid to employees on a monthly basis. The amount of the payment will be based on services worked (no matter which resource inside or outside the practice works them) related to the various technologies that are part of the Salesforce platform. This includes products/technologies as part of acquisitions known today or unknown ones to occur this calendar year. The products/technologies of the Salesforce platform including but not limited to: Sales Cloud, Service Cloud, Marketing Cloud, Commerce Cloud, Community Cloud, Platform, MuleSoft, Tableau, Einstein Analytics. The services that are inclusive of Salesforce include: project oversight roles (PM/EM), assessments, strategy-related, and ongoing maintenance and support. For contracts related to Industry Accounts, these “products” will be tracked under the “Practice” functionality in the 360 CRM system and will be validated by the Salesforce Practice Leader.

True-Up Process: For projects that are In Progress, the Commission will be paid assuming a 50% Gross Margin on the project and will include both the Revenue and Profit components to the Commission. After a project is Complete and all Invoices Paid, Accounting will calculate the actual project Gross Profit and then “true-up” or adjust the total Commission payment. The Engagement Manager will either receive an additional amount if Gross Profit is greater than 50% or have a deduction/clawback due if the Gross Profit is less than 50%.

The Employee will receive the commission payment once Accounting has had time to process and calculate the relevant commission payment and after any potential issues on the relevant payment have been resolved.

Termination Considerations for Commissions

In the event that an Employee’s employment is terminated, commissions due to the EM will only be for revenues recognized for services completed while the EM is employed by PSSP. Commissions will be calculated and paid at the time of separation. If a project is in progress when the employee leaves PSSP, the true-up process will be based on planned hours and projected project profitability at the time of separation.



Employees are not eligible to earn commissions while on a leave of absence unless approved in writing.

Engagement Managers who voluntarily move to a non-EM role in PSSP are eligible for 50% of their commission amounts for the first six months after they leave the EM role.

Engagement Managers who move to a non-EM role in PSSP because of a lack of sales performance are not eligible for any commissions after they leave the EM role.

Additional Administrative Provisions

1. Disputes & Write-offs: You will receive commission credit for the terms and scenarios described in the sections listed above, unless a dispute is raised by the Engagement Manager, Publicis account representative, Salesforce Practice Leader, or a representative of the CFO's office.  For Projects under dispute, the commissions payable on such projects will be withheld until the dispute is resolved. In the event that a write-off or revenue reduction is incurred, the Company reserves the right to recover any previously paid commissions related to the write off or revenue reduction.

2. Commission Calculation: Where recognized revenue is not available for purposes of commission calculation, invoiced and paid revenue will be utilized on an interim basis.

3. Possibility of Clawback: The company reserves the right to clawback paid commissions in the event invoices are not paid by customers for which commissions were calculated or if a credit is issued to a customer, affecting the overall revenue recognized. If the employee(s) has/have already received a commission payment on revenue recognized that has or will be refunded, the amount of the commission paid to the employee(s) will be due back to the company within 60 days.  Repayment can be made by way of deductions from future earned commissions or by direct reimbursement to the company from the employee.  The payback period can be extended at the company's discretion.

4. Certification Requirements: To be eligible for commission payment Employee must be current with the certification requirements applicable to him/her, as outlined by the Salesforce Practice Leader.  An employee who had otherwise earned a commission during the applicable period may have variable compensation withheld if certification has not been achieved at the time commissions are paid. If certification is not achieved in the subsequent commission period the commission will be withheld pending certification.

5. Historical Deals: Deals sold prior to January 1, 2020 will be paid out according to the prior plan.

6. Withholdings: All commission amounts to which Employee may be entitled to are gross amounts and are subject to deductions and withholds in accordance with applicable law.

7. Company's Right to Change or Modify Plan: The Company reserves the right to modify, suspend or terminate this Plan at any time. In the event of such modification, suspension, or termination, the Employee will be entitled to receive any commission earned prior to the date of the Plan's modification, suspension or termination.

8. Employment At-Will: This Plan shall not be construed as, and nothing in it is meant to create, either an express contract or an implied contract, or any promise of employment or any promise of any particular terms or conditions of employment. The Company does not guarantee employment for any period of time. This means that either the employee or the Company may terminate employment at any time, for any reason. No one at the Company is authorized to make any employee any oral promises, which would alter the employee's status as an employee-at-will. Furthermore, nothing contained in this Plan is intended to modify this at-will relationship.

________________________________________ Date 5/19/20

Jason English, Salesforce Practice Leader

Accepted by:

Print Name Joseph A. Arriaga ______ Date 5/19/20

Signature ________________________________

# EXHIBIT 2

Account Marathon Petroleum
Project Hauler Portal

| Invoice # | Invoices Amounts | Revenue Commissioned | Revenue Not Commissioned |
|---|---|---|---|
| 263327 | $ 32,125.00 | | |
| 264350 | $ 32,125.00 | | |
| 266392 | $ 32,125.00 | | |
| 266393 | $ 32,125.00 | | |
| 268264 | $ 128,500.00 | | |
| | $ 257,000.00 | $ 187,000.00 | $ 70,000.00 |

Account Marathon Petroleum
Project Customer Portal

| Invoice # | Invoices Amounts | Revenue Commissioned | Revenue Not Commissioned |
|---|---|---|---|
| 263287 | $ 233,002.25 | | |
| 263302 | $ 336,322.00 | | |
| 264806 | $ 486,469.00 | | |
| 264807 | $ 70,860.00 | | |
| 267155 | $ 58,240.00 | | |
| 268829 | $ (486,469.00) | | |
| 269119 | $ 486,469.00 | | |
| 269610 | $ 435,205.00 | | |
| | 1,620,098.25 | $ 676,833.00 | $ 943,265.25 |

Account Exxon
Project E2E Data Driven Engagement IMPLEMENTATION | Phase 2

| Invoice # | Invoices Amounts | Revenue Commissioned | Revenue Not Commissioned |
|---|---|---|---|
| 266875 | $ 291,941.00 | | |
| 268722 | $ 290,597.00 | | |
| 268723 | $ (291,941.00) | | |
| 268799 | $ (290,597.00) | | |
| 269007 | $ 309,776.40 | | |
| 269008 | $ 441,804.02 | | |
| 269399 | $ (441,804.00) | | |
| 269400 | $ (309,776.36) | | |
| 269457 | $ 414,450.30 | | |
| 269458 | $ 290,597.00 | | |
| 269830 | $ 116,203.20 | | |
| | $ 821,250.56 | $ - | $ 821,250.56 |

| Commission Rate for 58% Margin | Amount owed |
| --- | --- |
| 5.381449% | $ 3,767.01 |

| Commission Rate for 50% Margin | Amount owed |
| --- | --- |
| 5% | $ 47,163.26 |

| Commission Rate for 50% Margin | Amount owed |
| --- | --- |
| 5% | $ 41,062.53 |

| Total Commission Owed | $ 91,992.80 |
| --- | --- |